Good morning, Your Honors. My name is Paige Nichols, and I'm here on behalf of the appellant, Stephen Spradley. May it please the Court, a jury convicted Mr. Spradley of crossing the Missouri-Kansas border, intending to have commercial sex with a minor. We've raised several trial issues in the brief. I'm happy to talk about any of those or sufficiency, but I thought I'd start with the Allen instruction. This instruction told the jurors that if they failed to agree on a verdict, the case must be tried again, which would require a large investment of time and effort for no good reason. This is a bad instruction. This Court has said so more than once. It's not true that the case must be tried again. That's what this Court has noted before. And the costs of retrying the case are, frankly, none of the jury's business. This jury was deciding whether or not Mr. Spradley was guilty, and the costs of retrying the case have nothing to do with that. So the language really has no legitimate purpose. It can only be read to pressure the jurors to reach a verdict. Now, I don't read the government's brief as actually defending the language of that paragraph 2 of the pattern instruction. The government argues that it just wasn't coercive here. And so I think we're on the same page, or at least I don't think the government disagrees that there are problems with this language. But the language isn't the only problem in our case. In our case, we also have indications that the language was coercive and the procedure during which it was given to the jury was coercive because of timing factors especially, right? This Court has repeatedly said that we ought to be giving Allen-type instructions with the original instructions instead of in response to a deadlock. Here, we have — we did have that occur here. And then we have — Before you get to the next point, Ms. Nichols, can I ask you a question? I'm a little worried that our cases seem blatantly inconsistent. So that's not your problem, that's our problem. But I'm worried about your argument that seems consistent with McElhaney, but seems inconsistent with Cornelius. Whereas I interpret Cornelius, it weighs against coercion when the instruction is given after the judge is informed that the jury is deadlocked. I think I can bring these together. Good. I think. I'm going to try. Okay. I can only — in order to interpret the recent expressions that you've just shared here, in order for those to be consistent with the earlier case law, I think it's easy to read those as, look, it's not as bad to give the instruction in response to an announced deadlock as it is to give the instruction sua sponte, just because the judge thinks the jury is taking too long. But it is best to give them with the original instructions and not in response to a deadlock. So I don't think this Court can really say that this weighs in the government's favor. Maybe you'll decide it's neutral, but it certainly isn't in the government's favor. And I think plenty of cases in earlier times have emphasized that. So that's what I have to offer for that one. But also with respect to timing, I want to note, here we have a pretty short trial. If you clock all the timestamps through the record, we have about four and a half hours of evidence, four witnesses, a single count. And then the jury goes off to deliberate and takes about five and a half hours of deliberations, interrupted by one question about evidence. But they work for five and a half hours before they announce their deadlock. In this case, where we have only one count, and it's a pretty simple count, and four witnesses, that is a reasonable time to deliberate before declaring a deadlock. And post-Allen instruction, they deliberate for less than an hour before they convict. So . . . No, Mr. . . . And I'm sorry to keep interrupting you. That's what we're here for. I apologize. But there I worry about Arnie. Your point seems well taken, that, okay, well, then the judge gives an Allen instruction, they deliberate for less than an hour. That's also true in Arnie. And the Court found that the Allen instruction wasn't coercive.  And so I recognize that some of the timing issues are similar in Arnie. But in Arnie, the defendant didn't challenge the language that we're challenging here. So it doesn't really help us, because the Court isn't considering the impact of the language. It's just considering the giving of the instruction generally. So I don't think Arnie forecloses our argument here or really tells the Court much about how to view the language that we're focused on. I did want to mention as well, in this case, as opposed to some of the cases where this Court has found no Allen error, the evidence is not overwhelming. Additionally, we've got a jury that is telling us that they did their work. They followed those two instructions I have mentioned that went with the original instructions, the Allen-ish instructions. The jury comes back and tells the judge, we did what you told us to do. And those were instructions 18 and 20. We did what you told us to do. We looked at the evidence. We deliberated with logic and transparency. We searched the evidence in the exhibits. And we are still deadlocked. So again, the jury did its work, followed the instructions of the Court. Do you think that five hours of deliberation, regardless whether it's one count or 20, is an extensive period of time to indicate that there's a deadlock that cannot be changed? Do you really think five hours? Sure, absolutely. When you have a jury that lets the Court know that they've done the work they were asked to do, we see verdicts in much less time than that. Let me ask you this. Do you think it would have been okay if the Court had said, well, okay, we're going to take a break for the weekend, said nothing, you know, didn't give an Allen instruction or anything, said nothing, and brought him back in on the next Monday and said, you know, go back. And continue to deliberate. Would that have been okay? It would have been much better, because we would not have had that language about if you don't do this, then the case will happen. But you still think that you'd have a basis to get it reversed? I would probably be less, it's much less likely I would have raised this issue if we didn't have this language, especially given that the language, I mean, this question. You make some issue out of the proposition that when the jurors were leaving after the Allen instruction, two jurors alerted the court deputy that they had a question. And you suggest that the judge should have brought him back in and I think you say poll them, right? I don't believe I suggested polling, but to find out what the question was. Do you really think that's advisable for a district judge to ask open-ended questions in the presence of the jury about what are you thinking, your deliberation? No, I think that what should have happened is, I actually understand what the district court did. The district court chose not to ask the jurors to submit the question because some of them had already left. The point is, if the judge, I'm not saying the judge should have brought those two jurors in. Ideally, on Monday, before they go back in to deliberate, the judge would have asked the jurors to reduce their questions if they still had them to writing, like all their other questions, right? Give it to the bailiff, the bailiff would bring it to the court, and then everybody would decide how to answer it. But the only thing I'm asking this Court to do here is not to say the judge erred there. It just happens to be another piece of the record where the jurors, from the jurors' perspective.  I understand your point that this is a factor. It's not in and of itself. I understand that. But in order to be a factor, doesn't there have to be an objection saying, oh, judge, you should tell them to reduce their questions to writing and send them back in? And that didn't happen, right? Well, the lawyer asked the judge to hear the questions. I'm not sure he specifically said have them put in. He wanted the judge to hear the questions in one way or another. I can't remember exactly the wording. And so this was. But did the lawyer say that on Thursday or on Monday? On Thursday. Because the lawyer said, I think it might have something to do with him. But they're coming back. And then when they come back on Monday or whenever they came back, shouldn't the lawyer have said if he wanted to preserve, he or she wanted to preserve that factor, judge, would you please guide the jury and tell them that the questions they may have should be reduced to writing? I sure wish that had happened. There's nothing on the record on Monday. The first thing on the Monday record is we've got a verdict. So it may be that the jurors got in there and deliberated so quickly. I don't know what happened because there's no record there. If this Court chooses not to take that part of the record into account in considering the Allen instruction, that's fine. I think we have enough grounds for arguing for reversal anyway. This case is, you know, the McElhaney case is really pretty good for us. You know, there was in McElhaney was stronger in some ways. The language the Court used in that case was stronger. But our case is stronger in other ways. Our judge didn't give the jurors an option about going back in to deliberate. In McElhaney, the Court actually asked the jurors, hey, are you willing to keep trying? I'd like to see you try. Are you willing to try? And the jurors answered, yes, yeah, we're willing to try. Our judge told our jurors that if they didn't agree, the case must be tried again. In McElhaney, the judge actually said, I don't know what's going to happen. It might be tried again. Isn't the jury instruction given part of the pattern, jury instructions? It is part of the pattern, unfortunately. And I think this is the perfect opportunity for this Court to make it clear that judges should not be giving that part of the pattern instruction. And the other point I wanted to make about McElhaney was in McElhaney, after the instruction was given, in our case, again, it's less than an hour before they convicted McElhaney. It was several hours, plus the jurors asked to review some more evidence. They asked for a readback. And so they did the work after the Allen instruction that our jurors did before the Allen instruction. But this jury had, what, Friday, Saturday, Sunday, three days with all this on their minds. It was on their minds. And then they come back in, and they do deliberate. And they do what they're supposed to do, and that is to be willing to change their minds. Somebody changed their mind. We know that. Right. So if I may speak to the weekend and then reserve the rest of my time. So you're diminishing the continued deliberation and perhaps thoughtfully. I'm not diminishing it. This Court has said a short deliberation after the Allen charge is evidence, some evidence of coercion. Now, how much actual time was it after the, when they returned on Monday? How long did they take? You know, we don't know exactly what time they came in. The judge suggested they come in at 8.30. What time did the verdict come in? The verdict comes in, let me just, I've got a note here with the times. The jurors returned the verdict in open court at 9.30. And the minute sheet says they continued deliberations at 9 o'clock. So it looks like about half an hour.  All right. I think at this point I'd like to reserve the rest of my time for rebuttal, if that's okay. Sure. All right. Thank you. Good morning, Your Honors. James Brown for the United States. May it please the Court. Your Honor, this morning we're asking this Court to affirm the defendant's conviction. We think that the, all of the issues in this case can be viewed through the lens of the fact that there was overwhelming evidence against the defendant in this case. The first exchange that Ashley, who was the undercover agent, had with the defendant, she just said, needing to make some money, recently graduated and looking to make money for a new ride to cosmetology school. That was it. It was a neutral request for money. The defendant immediately responded by stating, I'll give you $500 to spend the weekend trading orgasms with me. He immediately injected the notion of money for sex. That's not illegal, is it? I mean, I guess maybe a prostitute, you know, paying a prostitute. Well, it is illegal. It's not a violation of 2424. No, but there are other things. That's just the first element. The second element is, he's the one who suggested, they continued to suggest that they have sexual relations even after she said that she was 17. She said, I'm 17, is that a problem? He said, let me send you a picture. And that is not a violation of the count in which he was adjudicated guilty. No, then we get to the third part. Then he suggested, why don't I come from Kansas City, Missouri to Kansas so we can do this? That those three things equal the violation. So there's overwhelmingly . . . After Ashley says, I think, that, well, I can't get there. I don't have a ride to get to you. If she had come to him, he wouldn't have been guilty of this charge. He wouldn't have crossed state lines in order to have commercial sex with a minor. Well, maybe, correct. We'll concede that. But the fact is, on these facts, he's the one who said, I will, he's the one who suggested he cross state lines to come have sexual relations. He offered to drive from his house in Kansas City, Missouri to Topeka. So, basically, we have overwhelming evidence on each of the elements. Absolutely. Because there was no instruction on his proposed defense of entrapment, in which we view the evidence not favorably to you, but favorably to the defendant. Now, so how, viewing the evidence favorably to the defendant, do we say that there is no evidence in which we can find either predisposition or inducement? Well, let's first of all . . . And I don't want to mess you up. If you weren't planning to talk about entrapment, I don't want to mess you up in your presentation. But your comments sort of spurred those questions. All right. Well, I'll talk about obviously whatever the Court wants me to talk about. That's why I'm here. So I'll obviously answer the Court's questions about entrapment. You know, the entrapment, there has to be an evidentiary basis for an entrapment instruction to be given. And he has to show an evidentiary basis for inducement and an evidentiary basis for predisposition. Let's talk about predisposition first. This defendant was eager and willing to commit the crime. So when we go to predisposition, there's no question that he wasn't predisposed. We know that from his very first e-mail. I'll give you $500 to trade orgasms for the weekend when she didn't even mention sex in her first e-mail. Yeah. He didn't know she's 17 at that point. Well, it shows that he's predisposed to trade sex for money. And then when she said, I'm 17, is that a problem? He says, oh, let me send you a picture. And then when she says, I can't get to Missouri, he goes, oh, I'll drive from Kansas City, Missouri, to Kansas. So there's no he was a willing and eager participant in this. And there's no way to get around that. There's no way to soft glove that. He was an eager and willing participant. So let me push back on that and just play devil's advocate. So let's say predisposition. He's predisposed to give her $500 to have sex. Well, all of the text messages have this LOL. He comes to her. He doesn't have $500. Now, you have a valid point. Well, there's ATMs. Well, that's true if I was viewing the evidence favorably to you. But I'm not under our law. I'm supposed to view it favorably to Ms. Nichols. And couldn't a reasonable fact finder, viewing the evidence favorably to the defendant, say, no, he was not predisposed to give her $500 for sex. Maybe he wanted to have sex with this attractive young lady for free. But a reasonable fact finder could find that he was not going to give her $500 to have sex. And that would have been an acquittal. We don't think that's reasonable given all the history of the text messages. And as far as the LOLs, I don't know if the court does a lot of texting. But LOL is common in almost lots and lots of texts. People use LOL all the time. It means laughing out loud. It's just sort of a cutesy thing that you put on an email. So that really doesn't mean anything. They try to make it like, oh, that means it's all a big joke. And it's all a big joke between them. But the LOL, there's no evidence that the LOL really means anything. So as a matter of law, viewing the evidence favorably to the defendant, we just rule. I guess we adjudicate. We issue an opinion saying LOL has no legal significance. Well, not on hand. Possibly being that it's just a big joke. I really want to be your boyfriend. The guy's obviously very lonely. There's talk about what do you want? Hugs and kisses and lots of sex. Well, he clearly is a terribly lonely guy. Ashley knows that. And so I'm just wondering. I think you've got a strong argument on entrapment If I was viewing the evidence favorably to you, I just don't know how you, with the LOL, that he doesn't have $500, that you say, as a matter of law, no reasonable fact finder could conclude that he was anything other than predisposed not only to have sex with her, but to cross state lines and to pay her for $500 will do that. Well, we'd like to just gently reiterate that we think the court may be placing a little bit too much emphasis on the LOL. I might be. But let me go to inducement. Inducement requires some threats or fraudulent statements or harassment or undue persuasion or something. Here, the inducement consisted of Ashley posting an ad saying, I need money to buy a car to go to cosmetology school. The defendant said, oh, I want to pay you $500 to have sex with me and trade orgasms for the weekend. I don't care if you're 17, and I'll come from Kansas City, Missouri to Topeka to do this. That's, you know, inducement, as this Court said. I thought that the inducement was, I can't get to you, so you have to get to me. If the LOL really is, you know, for predisposition or inducement, that you have to have fraud or anything like that, you know, this is a little bit of an unusual entrapment. Well, Your Honor, we don't see how saying, I can't get to you, I can't get to you, is really inducement. It's putting the ball in his court. But that's not saying, you need to come to me. You need to come here. You need to get in your car and drive across the state line. You know, that's just saying, I'm here, stuck in Topeka. My mom took my car or whatever it is. You know, she took me off social media. So we don't think that's inducement. What do you think of the picture of the, oh, I'm sorry. You were going to say something else. No, I don't want to interrupt the Court. Please go ahead. No, I don't want to interrupt the Court. Okay, I would just direct the Court's attention to this Court's statement in Ortiz that inducement implicates the obvious question of whether the defendant was eager or reluctant. The idea being that if somebody is eager, as he obviously was, it's really hard to find inducement, right? I mean, how do you induce somebody who's willing and eager to commit a crime? It's really hard to do. And I don't think there's any question that he was eager and willing to commit this crime. Can I ask you one last question? And I promise to quit barring you on this track. I'm happy to answer any questions. Well, I don't want to take your time with my colleagues. What about that filtered picture of this woman who's clearly not 17 years old? Well, you know, viewing the evidence favorably to the defendant, can we really say as a matter of law that he knew that this girl was under 18? Look, look, the filtered picture, you know, a filtered picture is filtered. It's not accurate. You know, the Court may say it obviously that she looked over 17. You know, if you walk down the street and look at young women, they dress like they're very... Adult. I've got a 16-year-old daughter. I take judicial notice. Okay, so not all 17-year-olds dress like they're young girls. Some of them dress like they're older women, right? He had no basis to think that she was over 17 just from the look of that photo. That photo doesn't portray any particular characteristic that would indicate that she's not 17. That is sort of something that they made up after trial and put in their briefs saying, well, obviously she doesn't look 17. That doesn't, that, we don't know how he perceived that photo. Well, if we don't know. His response, well, his response was. If we don't know, that's a problem for you. His response was, you're a doll. You're a doll. Oh, you're only 17? Let me send you one of my pictures. That was his response. He never told her she didn't look 17. Well, I promised to shut up, so I'll shut up. I didn't mean to interrupt. Did I interrupt, Your Honor? I'm sorry. You did not. I interrupted you. I'm sorry. You go ahead. Okay. We just think the photo is a non-issue. I got it. The photo is a non-issue. Now, I could move to the Allen instruction if the Court is finished with the trap. Wait a minute before you leave this. This was not Spradley's first rodeo, correct? At least in looking for sex on, is that correct? What was that evidence? The evidence was inconclusive and ambiguous. We tried to put on evidence that he had contacted other people, and I think that we were not able to put on everything we wanted to put on, and it came out as a wash, really. I don't think we had any conclusive or determinative evidence that he had done this before. I think we had suggestions in the evidence that it had happened, but nothing super concrete that we can rely on. Otherwise, I would have relied on it in the brief. Okay. You want to talk about the Allen instruction? Yes. As you get into that, you would concede that it's not correct what the instruction provided, and that is that it would have to be tried all over again. That's just wrong, right? We acknowledge that. Of course, we acknowledge that. We'd ask the Court to change the pattern instruction. It's hard to get that right in every case, because the courts, the district courts rely on the pattern instructions. But our precedent has affirmed in other circumstances where that very pattern instruction has been used, correct? Making the same inaccurate statements. Similar inaccurate statements have been affirmed in at least three cases, which we point out. In those cases, do we know whether the issue was specifically raised, and therefore, the fact that we signed off on this particular jury instruction, that since the issue was never raised, it's properly before us, and to say that that renders this Allen instruction problematic? Okay. I cite three cases. The first one, Arnie, it was not raised. In Smith, it was directly raised.  But there was also some softening language in that instruction. First, it said the case will be put to the parties, will be put to the expense of another trial, and then a couple sentences later, if the case is retried. So there's some softening, but it was raised. It was softened with an if. If it's retried. Right. And in Hernandez-Garcia, it was raised. The language was considered by this Court on appeal under a plain error standard. It was not raised below. But Hernandez-Garcia, that's my colleague says, well, that's plain error, so that's distinguishable. But if we look at page 876, the Court said plain error in this context means error that affects the defendant's fundamental right to a fair and impartial trial. So the Court didn't just decide it on the basis that the error wasn't plain under our law. The Court decided on the basis that there was no violation of the defendant's fundamental right to a fair and impartial trial, which is basically the same as a harmless error standard. So we think that... So essentially, there is no precedent that says this instruction is okay. There is precedent that strongly suggests that it does not violate a defendant's fundamental right to a fair trial. There is not any exact situation that matches this situation. So what exactly? Then you're saying that because it was raised here that we should apply a harmless error standard? Correct, Your Honor. Correct. Now, on that point, on that point, the defendant says that we do not argue harmless error under this issue, which is issue 2. Under issue 2, we do not discuss this. We do not discuss harmless error. However, under the cumulative error analysis, what we do argue, we do argue harmless error applies to all the errors. On page 41, we say, in light of this evidence, no alleged error committed by the Court would have affected the result of the trial and was therefore harmless. So we think that encompasses any Allen error. Mr. Brown, here's a problem I have with that. Frequently, and I emphasize frequently, the United States Government raises a waiver in forfeiture against defendants. The fact that you put harmless error in the cumulative error section is not the same as putting harmless error in the substantive section on issue 2. Doesn't that, in fairness in applying harmless error, mean that you waived the argument of harmless error on the Allen investigation? The point is very well taken, that we argue that what the Court said in almost every case, and we rely on that and fight about that all the time. That's true. But in this case, we actually did say none of the alleged errors could amount to anything because they're harmless. We actually did say that, and that does encompass any Allen error. We say none of the alleged errors. So that does encompass it. We could have been stronger. We should have been clearer. No question about that. But the fact that we weren't does not mean that there's a waiver if we address it in another part of the brief. We understand the Court's reluctance to look at it that way, but based upon the history of how we argued this, but we think it is still there. If the Court wants to disregard it, obviously, the Court has discretion to say, no, Government, you missed the boat here. That's not enough. And we'd accept that. Thank you. We'd ask the Court to affirm. Thank you. You have an extra minute and a half because he went over. And you can thank Judge Murphy for that. Thank you, Judge Murphy. I'm not going to acknowledge that. Excuse me. The Government has certainly given this Court some evidence of predisposition. But what matters is whether there's some evidence of lack of predisposition and some evidence of inducement. We've got both. I'll give you the list. Pardon me. Inducement. One, the officer waits to say she's 17 until he's got a fish on the hook. Two, the officer knows the legal age of consent in Kansas is 16 and deliberately makes her 17 over that age. Three, the officer, as the Judge pointed out, knows, has Ashley ask him to pick her up in Kansas. Her car won't make it to Kansas City. Four, the officer has Ashley keep coming back to the money. Are you bringing the money? Are you bringing the money? Even while he's trying to have a deeper conversation. Five, that filtered picture. Yes, send a picture of her that looks like she's, like you don't know how old she is. Okay. Predisposition. Before you go there, you're into this issue now. Do we consider, Bradley testified, correct? Yes. And the question is whether there's, you know, evidence that says that the jury instruction should have been given. Yes. In analyzing that, do you consider the evidence both in the government's case in chief and in the defendant's case where the defendant testified? Yes. It can come from either one. That's what I want to know. Then my question is, when Bradley testified, did he ever say, I did not think Ashley was under 18? Yes. He said there were signs that there's no way this 17-year-old would want to, I don't remember the exact language, but it is in his testimony. And I'm quite sure I pointed it out in the brief. He believed everybody online was lying anyway, that people understated their ages. Did he specifically say, I didn't believe she was 18? I believe he does. I think he's quite specific about that. If I may list the some evidence of lack of predisposition. One, he said during cross-examination that he had never communicated with women under, with any other women on dating apps who said they were under 18. The phone guy, the guy who looked at his phone, said there were no images on there that would be considered child pornography. And he also said that he had never previously paid for sex and that he didn't ever, he never have. I don't pay for sex. I never have. He said, I would pay money. I would pay someone money to spend time with me. So all of that is sufficient evidence of predisposition. What was his testimony vis-a-vis the picture, the image of Ashley that was not Ashley? He said he had put it through some kind of heuristics and determined that it had been highly filtered. So he didn't think that it was believable that this is what she actually looked like. Did he, okay, did he relate that image in any way to her age? I think he does. I do think he does. And his testimony is quite short. I'm pretty sure I talk about this in the brief. I'm sorry, I don't have the citations or the exact language for you right now. It was a long time ago. I need my memory refreshed. It was just yesterday I reread his testimony, so you'd think. But at any rate, we've got several errors in this case. We think this is a cumulative error case. At the very least, we've got Allen error and or we've got entrapment error, and this Court should reverse. Thank you. All right, thank you. This matter is submitted. And just an editorial comment. I thought both sides, frankly, as always, wrote excellent briefs and did an excellent job in your arguments today. This matter is submitted, and I think we're in recess until 8.30 tomorrow. Okay.